## SCOTT MOWRY v. JEREMIAH SHELDON.

The " Act regulating Water Mills," does not authorize any person to erect a mill dam in such a way as to flow out a dam erected for mill purposes above, even though no mill has been built or commenced thereon, unless the design of building a mill thereon has been abandoned ; if, however, the dam above is built for other than mill purposes, or if such purposes, originally entertained, have been abandoned, it is subject to be flowed out by the proprietor below.

The erection of a dam or mill privilege, available for mill purposes, furnishes *prima facie* presumption that the dam is intended for such purposes ; and the fact that such dam is slightly built is not sufficient proof of the contrary.

The proprietor of a dam, who has represented that he intended to abandon the dam for mill purposes, is estopped from denying that such was his intent, as against a person who has been influenced by his representations to build a dam below which flows back upon the dam above.

Whether the owner of a dam, built within the limits of a highway, but not within the travelled parts thereof, can sustain a suit for the flowing of his dam—quære ?

BILL IN EQUITY. The bill states, that in December, 1840, William Page was seized and possessed in fee simple of certain lands and their appurtenances, situate in Glocester on both sides of a natural stream of water, known as Durfey's Brook, and on the southerly side of and adjoining to the road leading from Chepachet past the house of Anthony Steere, on which lands there was a large fall in said stream of water ; that said Page wishing to erect a dam and mill on said stream, did in Decem-

ber, 1840, construct a dam thereon with a bulk-head and apron way, well fixed to use all of said water-fall ; that said dam, bulk-head and apron way ponded the water on said Page's land until March, 1841, when a small part of the dam was carried away ; that in January, 1842, said Page died, before he could conveniently repair said dam or erect his intended mill ; that said Page's estate was duly declared insolvent and sold to Brown Mowry, and, after said sale, to wit, in March, 1847, said dam was further injured and more of it swept away, but said bulk-head and apron way were left uninjured, and also a portion of each wing of said dam remained, and continued in this state until the filing of the plaintiff's bill. That the plaintiff, in October, 1849, purchased said lands and appurtenances, including said dam and water-fall and privilege, for the purpose of repairing said dam and erecting a mill thereon ; that on the 16th November, 1849, he commenced repairing and was only prevented from continuing by the inclemency of the weather ; that on 20th November, 1849, said bulk-head, apron way and portions of said dam still remaining, the defendant, having legal notice of the premises, entered upon the road aforesaid and upon land not belonging to him, and commenced with boards and gravel stopping the throat way of the bridge in said road across said Durfey's Brook, building a flume and dam there, and thereby stopping and ponding back the water of said stream, on plaintiff's bulk-head, apron way and dam to the depth of five feet, and preventing the plaintiff's repairs ; and that the defendant still continues to maintain said flume and priming and gravel at said throat-way of said bridge, and to pond back the water as aforesaid.

And the bill further states that the defendant, on the

18th November, 1849, entered on the lands of Jeremiah Sheldon, Jr., and erected a dam across said stream below the plaintiff's dam and flowed back said stream on the plaintiff's dam; and that the defendant has been repeatedly notified of the premises. And the bill prays that the defendant may be required to remove said dam from the throat-way of said bridge, and that he may be enjoined from keeping up said flume, priming and gravel at said bridge, and also from keeping said dam in said close so as to pond back the water, &c., and also for remuneration for said unjust occupancy, flowage and obstruction, aforesaid.

The defendant's answer set up, that the bounds of said Page's lands did not reach to the line of the travelled highway leading from Chepachet by the house of Anthony Steere; that the dam built by Page, was on or within the line of the highway and was not for mill purposes, but to kill out the bush on said land, and was but a slight structure, nearly swept away in a few weeks, and afterwards abandoned by said Page; neither Page in his life or the defendant, now owned or owns any right below said pretended dam, or had the means or right to use the water from said pretended dam; that the fall in said brook is below said highway on the land of Jeremiah Sheldon, where the defendant, with said Sheldon's consent, commenced preparing to erect a dam in August, 1849, with the design of building a mill thereon, and that the erection of the flume and gate at the eye of the bridge, was to regulate the flow of the water in furtherance of this design; that the plaintiff had not notified him of an intention to build a mill at said Page's dam, but on the contrary, had said that he was repairing said dam for the purpose of constructing a cranberry bog.

The cause was heard on the pleadings and the proof taken on both sides.

*Carpenter* and *Browne* for plaintiff.

*Manchester* for defendant.

GREENE, C. J., delivered the opinion of the Court.

The mill law literally construed, is broad enough to authorize the owner of an unoccupied privilege below, to erect a dam and mill thereon, and, thereby, to flow out an occupied privilege above.

This does not comport with the obvious policy and purpose of the law.

The first act upon this subject was passed in 1734. (Dig. p. 1745.) The preamble explains its object. It is in these words : " Whereas it has been found by experience, when some persons in this colony have been at great cost and expense for building of mills, serviceable to the public good and benefit of the town and considerable neighborhood, in and near to where they have been erected, that in raising a suitable head of water for that purpose, it has sometimes so happened, that some small quantity of lands or meadows have been overflowed and damnified, not belonging to the owner of such mill or mills, whereby several controversies and law-suits may arise, for remedy whereof ;   Be it enacted, &c." By the present law, express provision is made for the assessment of damages for fall on the land as well as for land. (Dig. 44, page 204, sec. 2.)

The law should receive a reasonable construction in accordance with its spirit and policy.

We think, therefore, that, where a dam above has been erected for mill purposes, the owner below has no right

to flow out such dam, even before a mill has been erected or commenced thereon, unless the design of building a mill has been abandoned.

If, however, the dam was erected for other than mill purposes, as for irrigation, or, if the original design of applying it to mill purposes has been abandoned; in either of these events it is subject under the mill law to be flowed by the proprietor below.

It is only the application, actual or intended, of the dam to mill purposes that exempts it from the operation of the mill law.

In the present case, we think the dam was originally built by William Page for mill purposes.

*Jenckes Brown* says, he levelled the fall at the request of Page, and at this time Page talked of building a mill thereon and proposed to Brown to be concerned with him in it.

William R. Page, (son of William Page,) helped to level the fall and states his father proposed to him, also, to assist in building the mill and to be concerned therein. A grist mill was to be put in the lower story and some card frames in the upper part.

Page had sixteen feet fall on his own land, and the dam was six feet and eleven inches, from the top thereof to the apron.

We think, as a general rule, that the erection of a dam or a mill privilege, available for mill purposes, furnishes *prima facie* presumption that the dam is intended for such purposes.

Nor will it be safe to say that, because the dam is weak or slightly built, the owner did not intend to put a mill on it. The dams erected on small streams in this State, particularly for grist mills and saw mills, are fre-

quently built in a very slight and unsubstantial manner. These mills do not, like cotton mills, require a steady power. When the pond is drawn, the miller can wait until it fills again.

Without pretending to be very exact in our knowledge of this dam, we think we may safely say it is entitled to the ordinary presumption in its favor, especially when we consider its height and the amount of fall which the owner had on his own land. It is true a breach was made in it a few months after it was built, in the spring of 1842, but William R. Page says this was done by a freshet ; and we all know, strong dams are sometimes carried away by freshets. The answer says it was carried away because it was not strong enough to hold the ordinary flow of the river.

The level of Mr. Cushing shows the height of the dam was six feet and eleven inches.

Jenckes Brown thinks, there might have been five or six feet fall there. He says it was not the intention to flow out the fall by this dam ; by which we understand he means all the fall on Page's land, which was sixteen feet. It certainly must have been the intention to flow out six feet and eleven inches, that being the height of the dam.

Some manufacturers prefer to build a weak dam with a small outlay, and take the chances of repairing, to a heavy outlay and a strong dam, especially on small streams.

This may be bad economy, but the owner has a right to judge for himself, and an error in judgment ought not to subject him to the loss of his privilege.

Again, he may not have the means to make a heavier outlay and build a weak dam at first, hoping to make it

stronger afterwards. The evidence shows that Page was embarrassed and of small means.

We do not find there is any evidence in the case to show that the dam was not intended for mill purposes, except the answer of the defendant and the testimony of James Bates.

The testimony of this witness is too indefinite to be relied upon. All it amounts to is, that Page said he did not know that he should build anything, he thought the dam would improve the condition of his meadow. And in reply to a remark of the same witness that it would make a good cranberry bog, he said, yes.

The answer is more definite. It alleges that the design of Page in building the dam, was nothing more or less than to kill the brush and that he so declared at the time. The Bill states that Page's design in building the dam was to erect a mill thereon, and the answer, so far as it negatives this allegation, is evidence. The answer does not state to whom Page declared his intention, and the defendant offers no proof on the subject, except the testimony of James Bates, to which I have already adverted.

Giving to the answer all the effect to which by the rules of law it is entitled, we, nevertheless, feel bound to say we think it insufficient evidence on which to decree that the intention of William Page was not to occupy the dam for mill purposes, against his unequivocal acts and declarations, as proved by Jenckes Brown and William R. Page, and against the strong *prima facie* presumption, derived from the fact that the dam was available for mill purposes, and that the owner had sixteen feet fall on his own land.

This fall he might, when of more ability, occupy at the same dam.

It should be recollected, too, in considering this subject, that the right of the owner of the dam to occupy it, is an incident of his title to the land and he ought not to be deprived of it, even upon payment of damages, except on clear and satisfactory evidence, that he never intended it for mill purposes or that such intent had been abandoned.

The next question is, has the original design of the dam been abandoned by the original owner or any of his successors.

William Page died in January, 1842, and the break in the dam, above adverted to, was probably made in January, 1841. William Page was strained in his means and made no effort to repair it during his life.

Brown Mowry purchased it in March, 1843, and, as he says, either to occupy it himself as a water privilege or to sell it to some one who would.

The dam had an apron way and bulkhead and, after the break by the freshet, the gate was taken out of the bulkhead.

In October, 1849, the plaintiff bought and, in November following, commenced repairing and re-building the dam and put it in its present condition.

It was contended by the defendant's counsel that when the proprietor above builds his dam, he must in order to protect himself from flowage from below, build his mill with reasonable diligence.

We do not so construe the mill law. We think a dam erected for mill purposes cannot be liable to flowage from below, unless the neglect to occupy it, in other words, the non-user, is continued for such a length of time as will afford a reasonable ground to presume the design of a mill has been abandoned.

Then there are other circumstances to be considered besides mere lapse of time. Thus the presumption of abandonment would require much more evidence to support it, in the case of a privilege of great power and value than where the power and value were small. It is reasonable to presume the owner of a dam will use it in the way most for his interest and a contrary intent ought not to be inferred except from circumstances of the most unequivocal nature.

So a man may buy a privilege with a dam thereon, on speculation, not meaning to build himself, but to sell to others to build and, while he holds it, his privilege is not liable to be flowed out.

Again, a man may not be able to build and holds on in the hope of being able to build hereafter, or he may think the state of the business, he intends to embark in, does not warrant his building for the time being.

The counsel for the plaintiff contended that nothing short of a non-user for twenty years would raise a presumption of abandonment.

Without attempting to fix any definite time of non-user from which the law will infer an abandonment, and without saying that the time in the present case, if unexplained, would be sufficient, we think we may safely say the time in the present case in connexion with the circumstances is insufficient to justify such inference.

In connexion with this subject, it is important to consider the testimony of Brown Mowry, who owned the estate from March, 1843, to October, 1849, and who says he bought, either to occupy himself or to sell it to some one else to occupy, thus negativing any intent in fact on his part to abandon the privilege.

If we infer an intent to abandon from the non-user while he owned the estate, we do so when we know, if he is to be believed, he had no such intent. It is said by the counsel for the defendant, that, leaving the dam not only unoccupied for such a length of time, but so injured as not to pond the water and taking the gate out of the bulkhead were calculated to mislead the owner below, who might go on and erect his dam in the belief that the privilege was abandoned.

We think in such a case it is the duty of the owner below, before he attempts to flow out the privilege above, to enquire of the owner thereof.

If the owner of the upper privilege acts in good faith with the actual intent to repair the dam and to occupy it or sell to some one who will, we do not think he ought to lose his privilege, because he neglets to repair his dam.

Such a construction of the mill law would strip the proprietor of the upper privilege of an important attribute of his property, upon a presumed intent contrary to the fact.

In the present case the dam remained, though out of repair and not ponding the water, and that was notice to the owner below, at least so far as to put him on inquiry.

It is to be observed there is a wide difference, under the mill law, between the liability of the owner of a dam to be flowed and his right to flow others. It may be necessary for him to proceed with reasonable diligence to erect his mill, if he means to claim a right to flow another's privilege.

This was so held by the Supreme Court of Massachu-

Mowry v. Sheldon.

setts under the mill law of that State.  *Gersham M. Fitch & another* v. *Jona. C. Stevens*, (4 Met. 496.)

Is this aspect of the case changed by the conduct of the complainant since he became the purchaser?

The bill alleges he bought the estate for the purpose of erecting a mill thereon.

The answer states, the complainant (in reply to a question put by the respondent to the complainant,) stated to the respondent that his, the complainant's object in ponding the water by his dam was to make a cranberry bog, and did not otherwise pretend to the respondent.

The answer is evidence for the defendant, so far as it is responsive to the bill, but the answer does not deny the allegation of the bill.

And Seril Paine swears he carted boards to the dam, and, after this and before they began to work on the dam, the complainant told him his object was to make a cranberry bog.

Admitting the complainant made these statements as represented in the answer and by the witness, still the evidence is conclusive to show that the complainant's object was to build a mill.

But, although such might have been his object, still if he represented to the respondent a different intent and the respondent was influenced by such representations to build his dam, the complainant would be estopped from denying them to be true.

The answer contains no allegation that the respondent believed these representations or was in any way influenced by them.

But although they cannot operate as an estoppel on the complainant, they are evidence and strong, but not conclusive, evidence as to what in fact was his object.

51

But upon this point and giving to the answer all the effect to which an answer in chancery is entitled, so far even as to consider the representations as proved, still we think the evidence that the intent of the complainant was to build a mill is conclusive.

The remaining ground of defence is, that the dam and bulkhead are erected on a public highway.

The plaintiff's land is bounded on the highway, but where the line of the highway is, has been a disputed point in the cause.

If the plaintiff's dam were within the limits of the highway, but not within the limits of the travelled part of the highway, it would be necessary to decide, whether such a defence could avail the defendant. The plaintiff is the owner of the soil to the centre of the road. But it is not necessary to decide this question. We are satis-fied the dam is on the plaintiff's land and not within the limits of the highway.